# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ANTHONY GONZALES, | ) | CASE NO. 7:05CV5025 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court for review of the final decision of the Commissioner of Social Security. Plaintiff Anthony Gonzales filed an application for disability benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq, which was denied initially and upon reconsideration. (Tr. 57-62, 65-68). On January 20, 2005, following a hearing, an administrative law judge found that Gonzales was not under a "disability" as defined in the Act at any time when he met the insured status requirements of the law. (Tr. 10D-10R). On August 31, 2005, the Appeals Council of the Social Security Administration denied Gonzales's request for review. (Tr. 5-7). Thus, the decision of the ALJ stands as the final decision of the Commissioner from which Gonzales takes this appeal pursuant to 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Gonzales was born in 1965, and worked as a construction laborer and as a driver, intermittently until the onset of his injury on May 14, 1999. (Tr. 85). In his Disability Report, Gonzales alleged disability due to lower back pain. (Tr. 85).

**Medical and Functional Capabilities Assessment Evidence**

On May 25, 1999, Gonzales presented to the emergency room with complaints of low back pain and right leg pain (Tr. 169).  He reported injuring his back when lifting plywood on May 14, 1999 (Tr. 169).   The examination was normal except for an exacerbation of pain on forward and right lateral flexion.  (Tr. 169).  He was diagnosed with low back pain and radiculopathy and was prescribed 800 mg Motrin and advised to alternate ice and heat (Tr. 169).  On June 8, 1999, Andrew Messer, M.D., assessed low back pain and radicular symptoms with a "fairly negative exam" (Tr. 225). However, an MRI performed on June 10, 1999, revealed an L5/S1 disc bulge with mild compression on the right S1 nerve root. (Tr. 224).  Dr. Messer noted at that time that the radiculopathy was possibly chemical in nature.  He released Gonzales to return to work as of the following Monday, June 14, 1999.  (Tr. 224).

Although Gonzales returned to work, he continued to complain of back pain.  On July, 8, 1999, Gonzales presented with back pain, and stated there had been no improvement in his back pain and that the pain in his buttocks and right leg was worse than his back pain.  (Tr. 223).  Gonzales had tried the Medrol Dosepak that was prescribed for him, but reported that it caused him confusion.  Dr. Messer prescribed epidural injections and physical therapy, and Gonzales was released to return to work with a 25-pound lifting limitation and a restriction of no repetitive work below knee level. (Tr. 223).

His continuing low back and radiating pain down the right leg precipitated surgery on October 14, 1999.  (Tr. 163).  Gonzales underwent a right L5/S1 wide laminotomy, partial medial fasciectomy and foraminotomy, excision of far lateral disc herniation and right L5/S1 nerve root compression (Tr. 163-67).  In an October 28, 1999, follow-up report,

2

Dr. Messer noted "significant improvement" in Gonzales's overall condition, but continuing "episodic sharp pains in the right leg." (Tr. 218).  Spinal conditioning was recommended. (Tr. 218).

Gonzales attended physical therapy three times a week for approximately six weeks. Then, on January 11, 2002, Gonzales presented again to Dr. Messer, reporting that his condition had declined since his last appointment in October.  (Tr. 217).  Dr. Messer ordered a second MRI that showed some chemical irritation from the disrupted disc, but there was no evidence of epidural fibrosis, or residual and recurrent disc herniation.  (Tr. 216).  In Dr. Messer opinion, Gonzales had reached maximum medical improvement for his work-related back injury of May 1999. (Tr. 216).  Dr. Messer also stated that Gonzales "appear[ed] quite comfortable and essentially he could return to work, but should avoid repetitive work below knee level."  (Tr. 216).

Dr. Messer conceded that he was unable to substantiate by MRI why Gonzales continued to have pain, although he did not question that Gonzales experienced "continued back pain," and suggested that the pain " may be due to a discogenic origin." (Tr. 213).  Another epidural injection was prescribed, but Gonzales did not keep that appointment (Tr. 213).  Dr. Messer stated that if Gonzales's pain became "unbearable," then his future medical care would be "discography, and if concordant pain is obtained, then possible lumbar fusion." (Tr. 213).

In an attempt to return Gonzales to work, Dr. Messer ordered a functional capacity evaluation ("FCE") on February 22, 2000, a copy of which is not in the record but which is described by both Dr. Messer and Rehabilitation Consultant Steve Kuhn (Tr. 213, 127-28). The FCE indicated that Gonzales could perform medium work including occasional lifting

3

of 40-50 pounds and frequent lifting of 30-35 pounds. (Tr. 213).  Dr. Messer added a recommendation that Gonzales avoid repetitive work performed below knee level, and that he limit his pushing and pulling to 60 pounds.  (Tr. 213).  He could squat and kneel on a frequent basis and crawl on an occasional basis and could perform all other aspects of work (Tr. 213).

Gonzales called Dr. Messer's office in June 2000, requesting a prescription for additional physical therapy, which was refused.  (Tr. 211).  In a letter dated November 13, 2000, Dr. Messer stated that he had not seen Gonzales for nine months and that he would not formally recommend physical therapy because, while it provided Gonzales with short-lived relief, there was a very low likelihood that it would improve his condition. (Tr. 212).

Gonzales attempted to return to work as a dishwasher from the end of April through August 2001, but on September 6, 2001, Gonzales returned to Dr. Messer's office stating that his pain was continuing and worsening, and that he had pain in his low back and throughout his right leg and foot.  Dr. Messer's physician's assistant reviewed the MRI from January 12, 2000, and observed that Gonzales had "obvious degenerative disc at L5-S1 level which could correspond with his back pain and his posterior thigh and calf pain."  (Tr. 211).

Dr. Messer authorized a discogram, and Dr. Messer and Gonzales discussed the results of the discogram and treatment options on October 4, 2001.  At that appointment, Gonzales stated that he did not feel that he could continue to live with his pain, that he was unable to work, and that the pain was getting worse, not better.   The discogram showed a high density zone at L5-S1, and it exactly duplicated his back pain and right buttock pain (Tr. 209).  Dr. Messer recommended surgical intervention and a lumbar interbody fusion,

4

though surgery was not performed at that time.  At this appointment, Dr. Messer also noted that Gonzales had been in a motor vehicle accident on October 1, 2001, but Dr. Messer did not attribute the lower back and leg pain to the accident.

At the request of the worker's compensation insurance carrier and under the direction of Patrick Bowman, M.D., Gonzales had a third MRI performed on March 15, 2002. The MRI revealed mild right paracentral disc protrusion at L5-S1, a tear in the annulus fibrosis, and mild diffuse disc bulge at L4-L5.  The MRI showed no spinal or neural foraminal stenosis.  (Tr. 242).  On March 18, 2002, Gonzales underwent a total diskectomy for decompression at L5-S1 and a lumbar interbody fusion. (Tr. 236-37).  Shortly after he was discharged from the hospital, Gonzales presented to the emergency room with complaints of back pain, pain at his incisional site, and burning with urination.  (Tr. 228-30). Gonzales had been unable to fill his prescription for pain medication because the insurance carrier had not authorized payment.   The emergency room physician administered Demerol and Vistaril and told Gonzales to follow up with Dr. Bowman, which he did.  (Tr. 229).  Dr. Bowman prescribed additional pain medication that was made available to Gonzales through Dr. Bowman's office.

On May 17, 2002, Dr. Bowman examined Gonzales and found that he had improved.  On examination, Dr. Bowman noted a mass at the middle to upper thoracic region that he believed was a muscle spasm.  Gonzales had a normal EMG.  (Tr. 316). Between May 31 and July, Gonzales attended physical therapy sessions.   At the commencement of those sessions, Gonzales stated that his pain ranged from 7 to 10 on a scale of 10. (Tr. 272).

In a follow-up examination with Dr. Bowman on July 10, 2002, Gonzales continued to complain of a fair amount of generalized pain, though he was trying to increase his activity. (Tr. 315). He noted that the physical therapy had aggravated his pain. (Tr. 315). A CT scan showed that his fusion was solid. (Tr. 315).

In August 2002, Dr. Bowman recommended that another FCE be performed, which occurred over several days from December 12, 2002, through January 29, 2003. (Tr. 274 to 306, 314). The FCE was conducted by physical therapist Betsy Yarborough. In Yarborough's opinion, Gonzales, at a minimum, was able to lift 15 pounds occasionally and 13 pounds frequently, sit for 18 minutes, stand for 19 minutes, and walk for 30 minutes. (Tr. 275). She noted that Gonzales could do more physically at times than he demonstrated, and that he was self-limiting in his actions and activities throughout the tests. (Tr. 274-75). Due to these self-limiting behaviors and Gonzales's failure to demonstrate full physical effort, Yarborough was unable to identify maximum work tolerances for his employment. In February 2003, Dr. Bowman reviewed the assessment and found Yarborough's assessment was reasonable. (Tr. 312). At that time, Gonzales continued to take Vioxx, Darvocet, and Soma for pain and muscle relaxation.

A residual functional capacity evaluation was performed by the state agency physician, Jerry Reed, M.D., on February 25, 2003. Dr. Reed determined that Gonzales could lift and carry 20 lbs occasionally and 10 lbs frequently, that he could stand, walk, and sit for 6 hours at a time with normal breaks. He questioned the reliability of testing given that Gonzales tested positive for four of seven Waddell's signs. But he also acknowledged that on special testing, abnormal illness behaviors were present. (Tr. 148). Dr. Reed determined that many tests were "suggestive of low effort on Mr. Gonzales' behalf." (Tr.

6

148).  Dr. Reed stated: "[t]hough pain certainly is an issue; in the lack of effort on Mr. Gonzales' part, plus the documented solid fusion as well as no other neurologic deficits being demonstrated, does leave the conclusion that perhaps there is some secondary gain on Mr. Gonzales' part referable to his current status."  (Tr. 148).

Gonzales sought treatment for pain between his shoulders and throughout his neck from James J. Simpson, M.D. (Tr. 308).  On examination, Dr. Simpson found that Gonzales had good range of motion of the neck although it pulled.  (Tr. 308).  He ordered an MRI that did not show any evidence of a rotator cuff injury.  (Tr. 308).  Dr. Simpson opined that Gonzales's primary problem was myofascial pain along his axial skeleton from his neck down and recommended therapy.  (Tr. 308-09).  He referred Gonzales to Michele L. Arnold, M.D., for electrodiagnostic testing.

Gonzales continued to participate in physical therapy in April and May 2003 (Tr. 329-33), although he cancelled on a few occasions.  Ultimately, Dr. Bowman discharged him from therapy.  (Tr. 333).  On June 13, 2003, Dr. Bowman noted that Gonzales walked haltingly with a fair amount of guarding.  (Tr. 328).  He was neurologically intact with no atrophy.  (Tr. 328).  Dr. Bowman provided his opinion that Gonzales "does have legitimate limitations, but is employable." (Tr. 328).  In a letter of clarification dated July 20, 2003, Dr. Bowman stated that Plaintiff had "significant residual symptoms which significantly interfere with his ability and potential to remain active through a given day."  (Tr. 327).  He opined that "this will be a significant impediment for him to be involved in gainful employment which involves long hours of strenuous activity."  (*Id.*)  Dr. Bowman also stated that Gonzales "continues to require frequent breaks and periods of recumbency through the day in order to maintain reasonable levels of comfort and function."  (*Id.*)

7

On August 11, 2003, Dr. Arnold's electrodiagnostic assessment revealed no evidence of peripheral neuropathy, right or left cervical radiculopathy, or median or ulnar neuropathy on the right. (Tr. 354). Dr. Arnold assessed myofascial pain syndrome (Tr. 354). In September 2003, Gonzales presented to the same clinic and was treated by Trisha R. Summerlin, M.D. Gonzales complained of chronic neck, back and all-four extremity pain, rating his pain that day as a 10/10. On examination of the neck and back, Dr. Summerlin noted inconsistent behavior throughout, with tenderness to pressure "over spine, traps, rhomboids, gluts and piriformis muscles." (Tr. 355). She noted he had full strength, a symmetric and non-antalgic gait, the ability to walk on his heels and toes without difficulty and grossly full range of motion in all planes of the back. (Tr. 355-56). In follow-up a month later, Dr. Summerlin's plan was to assist Gonzales with pain management with referral to a psychologist and biofeedback specialist. (Tr. 357).

In October 2003, a follow-up examination showed grossly full range of motion of all planes in the back. (Tr. 357). Once again, referral to a pain clinic was recommended.

### Gonzales's Testimony

Gonzales testified at the administrative hearing held on December 2, 2004 (Tr. 26-50). He was 38 years old at the time of the hearing, and is now 40. He finished either the 10th or 11th grade, and has not earned a GED. (Tr. 29). He has claimed disability due to pain in his back and right leg. (Tr. 31). Gonzales currently takes Darvocet three times a day and Soma one or two times a day for pain. (Tr. 31). He had taken Vioxx before it was removed from the market. (Tr. 32). The only other thing that relieves his pain is to lie down. Gonzales stated that he lies down four or five times per day, for "a few hours." (Tr. 33). He explained his daily activities to include loading and unloading the dishwasher and

making himself lunch, but his primary activities during a typical morning, afternoon and evening include those activities that he can do while lying down: watching television, listening to the radio, reading the newspaper, talking on the phone and visiting with his wife. (Tr. 35, 36). Gonzales also performs 20 to 30 minutes of exercises per day at home, which he has done for four years. (Tr. 36). He can only sleep 5 to 6 hours per night, and that sleep involves tossing and turning. (Tr. 37). He is able to bathe, shave and dress without assistance; he can water the lawn and mow the grass, though at times he must have his wife finish the mowing. (Tr. 39-40). Gonzales does not socialize much outside family visits. He attempted to return to work in 2001 as a dishwasher, but the amount of standing, bending and stretching caused him too much pain and he had to stop working. (Tr. 45, 99). Gonzales testified that he is able to stand for as long as 15 minutes before he needs to sit. (Tr. 46).

Gonzales also testified that he had worked with a vocational rehabilitation consultant, Steven Kuhn, who was appointed by the Nebraska Worker's Compensation Court to assist Gonzales with returning to work. Gonzales testified that it was Kuhn's opinion that Gonzales was not able to return to work because he would require so many breaks to lie down during the workday. (Tr. 47).

### Vocational Expert Opinion

Vocational expert, William Tysdale, also testified at the administrative hearing (Tr. 50-53). The ALJ asked the vocational expert to assume a hypothetical worker, an individual of the same age, education, and past relevant work as Gonzales who could lift and carry 20 pounds occasionally and 10 pounds or less frequently. (Tr. 51). The hypothetical worker could stand or walk with normal breaks for a total of four hours in an

9

eight-hour workday and sit for six hours with the ability to alternate between sitting and standing or walking to relieve pain or discomfort. (Tr. 51-52). The worker's ability to push and pull required to operate hand or foot controls was limited to the same extent as his ability to lift or carry. (Tr. 52). He should never climb ladders, ropes or scaffolding and was limited to occasional climbing of stairs or steps. (Tr. 52). The individual could occasionally balance, stoop or kneel. (Tr. 52). He could not be exposed to concentrated extreme heat, cold, humidity or vibration. (Tr. 52). Based on those hypothetical conditions, the ALJ inquired whether there would be any positions that exist in significant number in either the national or regional economy that the hypothetical worker could perform.

In response, the VE testified that such an individual could perform the job of truck driver as Gonzales described it in exhibit 4E, although not as that job is described in the Dictionary of Occupational Titles. (Tr. 52). The VE also stated that the hypothetical worker could also perform the jobs of electronics assembler (100,000 jobs in the national economy), and small products assembler (125,000 jobs in the national economy) (Tr. 52-53). When the ALJ asked whether there would be any jobs available to the hypothetical worker in the regional or national economy if the hypothetical worker were also limited by the need to lie down for more than an hour and a half a day, the VE stated that none of the jobs he had described would exist for such a worker. (Tr. 53).

### THE ALJ'S DECISION

The ALJ determined that Gonzales had not engaged in substantial gainful activity since the onset of his disability on May 14, 1999. He found that Gonzales is status post microdiscectomy and decompression and total discectomy for decompression of L5-S1, and that he has degenerative disc disease of the L5-S1 level and experiences back and

leg pain, which are impairments that are considered to be severe under the Social Security regulations.  The impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P., Regulation No. 4.

The ALJ determined that Gonzales's testimony and his allegations regarding his limitations are not totally credible for reasons explained below.  He also found that Gonzales has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, to stand and/or walk (with normal breaks) for at least 4 hours in an 8 hour workday, to sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, is unlimited in push and pull activities, including operation of hand and or foot controls, other than for the weights as shown for lift and/or carry above, with postural limitations of occasional, except never any climbing of ladders, ropes or scaffolds, and has no manipulative, visual or communicative limitations, and has environmental limitations of no concentrated exposure to extreme heat or cold, wetness or humidity, or vibration.

The ALJ determined, based on the RFC and the testimony of a vocational expert, that Gonzales could perform his past relevant work as a dump truck driver as it is described in Exhibit 4E, that he retains the skills transferable to a light exertional level, and that he also has the residual functional capacity to perform a significant range of light work, such as an electronic assembler, and a small products assembler.  For these reasons, the ALJ determined that Gonzales is not under a disability as defined in the Act.

## ISSUES PRESENTED

Gonzales seeks reversal of the Commissioner's final decision on four grounds. First, Gonzales argues that the ALJ failed to consider the opinion of his treating physicians, specifically including Dr. Bowman's opinion that Gonzales required frequent rest breaks,

11

including periods of recumbency, throughout the workday.  Second, Gonzales contends that by disregarding Dr. Bowman's opinion and by discounting Gonzales's credibility, the ALJ erroneously concluded that Gonzales was capable of performing sedentary to light work.  Gonzales's third basis for appeal is that the ALJ failed to consider the opinions of a certified vocational rehabilitation counselor, Steven Kuhn, who concluded that Gonzales was totally disabled.  The final ground for appeal is that the ALJ failed properly to apply the law of the Court of Appeals for the Eighth Circuit, opting instead to rely upon law of the Tenth Circuit Court of Appeals.

## STANDARD OF REVIEW

When reviewing an ALJ decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996).  Under this standard, substantial evidence means something "less than a preponderance" of the evidence, *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998), but "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Ellison v. Sullivan*, 921 F.2d 816, 818 (8th Cir. 1990).  "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision."  *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (citing *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)).  In determining whether the evidence in the record as a whole is substantial, a district court

12

must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The substantial evidence standard "allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal." *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir.1991) (citing *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)).  If the district court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision "merely because substantial evidence would have supported an opposite decision."  *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).  Rather, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).

## ANALYSIS

### "Disability" Defined

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered

separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).  The physical or mental impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

**Sequential Evaluation**

In determining disability, the Act follows a sequential evaluation process.  *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work.  *Id.  See Cox v. Barnhart*, 345 F.3d 606, 608 n. 1 (8th Cir. 2003) (referring to the five-part test).  If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability.  *Id.*

The ALJ undertook the familiar five-part analysis in determining whether Gonzales is disabled.  In determining that Gonzales was able to perform at least some of his relevant past work and other jobs available in the regional and national economy, the ALJ relied on the VE's opinions that were based on the ALJ's determination of residual functional capacity.  Gonzales disputes the ALJ's conclusions at the fourth and fifth steps, arguing that if the ALJ had accorded the proper weight to his treating physician's opinion, to the vocational consultant's opinions, and to his own testimony, then the ALJ would have concluded that Gonzales was disabled as defined in the Act.

**Residual Functional Capacity**

An ALJ is required to determine a claimant's RFC based on all of the relevant evidence. *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004).

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). "[S]ome medical evidence," *Dykes v. Apfel,* 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace[.]" *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional. *See* 20 C.F.R. § 404.1545(c); *Baldwin,* 349 F.3d at 556 (internal citations omitted).

*Masterson v. Barnhart*, 363 F.3d 731, 737 -739 (8th Cir. 2004).

In determining Gonzales's RFC, the ALJ primarily relied upon the conclusions reached by the state agency physician, Dr. Reed, who performed an FCE on February 28, 2003. The ALJ recognized that Dr. Reed is considered a "nonexamining source" and that the weight given to such sources "depends on the degree to which they provide supporting explanations for their opinions." (Tr. 10L). The ALJ also relied on what he asserts is an absence of evidence, that is, that none of Gonzales's treating physicians was of the opinion that he is disabled. In support of that assertion, he cited Dr. Messer's report dated January 13, 2000, Dr. Bowman's note of June 13, 2003, and Dr. Bowman's correspondence date July 20, 2003. The ALJ also relied on comments made in Reed's FCE report that Gonzales was "less than fully cooperative or put forth less than maximal

15

efforts during the testing," which he found suggestive of exaggerated symptoms and limitations.  (Tr. 10-O).

If a treating source's medical opinion about the nature and severity of the claimant's impairments is well-supported by medical evidence and is not inconsistent with other substantial evidence in the case, the treating source opinion is entitled to *controlling weight*.   20 C.F.R. § 416.927(d)(2).   The regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments." 20 C.F.R. § 416.927(a)(2).   "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source" who provides the claimant with medical treatment or evaluation on an ongoing basis.  § 416.902.  By definition, the controlling weight afforded to a "treating source" "medical opinion" is reserved for the medical opinions of the claimant's own physician, psychologist, and other acceptable medical source. *Tindell v. Barnhart,*  444 F.3d 1002, 1005 (8th Cir. 2006).   In this case, I find that Dr. Bowman's opinions are entitled to controlling weight, and Dr. Reed's opinions are not.

An ALJ may discount treating physician opinions if other medical assessments are supported by *superior* medical evidence, or if the treating physician has offered an opinion inconsistent with other evidence as a whole.  *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)); *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005).   "The ALJ's function is to resolve conflicts among 'the various treating and examining physicians,'" assigning weight to their opinions as appropriate.   *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v. Shalala*, 52 F.3d 784, 785,

16

787 (8th Cir. 1985)), *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give "good reasons" for that weighting. *Prosch,* 201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2)). "The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors." *Shontos v. Barnhart,* 328 F.3d 418, 428 (8th Cir. 2003). Generally, the longer and more frequently a doctor has treated, the greater the weight given. 20 C.F.R. § 404.1527(d)(2)(I).

In determining Gonzales's residual functional capacity, the ALJ did not rely on the opinions of Dr. Bowman, Gonzales's treating physician. Gonzales argues that the ALJ erred in failing to consider Dr. Bowman's opinion that Gonzales would require frequent periods of rest and recumbency to make it through a normal workday. Because I find that the ALJ did not mention Dr. Bowman's opinion relative to rest and recumbency, I agree that the ALJ erred. At a minimum, the ALJ was required to state the basis for wholly discrediting this opinion.

While the ALJ relied on the fact that none of Gonzales' treating physicians set forth his or her opinion that Gonzales is disabled, the ALJ's reliance on the absence of such opinions is untenable.[1] He relied on Dr. Messer's report dated January 13, 2000, but that opinion was provided before Gonzales applied for benefits and before Gonzales's spinal fusion was performed (Tr. 216); on Dr. Bowman's note of June 13, 2003, in which he states

---

[1] Such opinions are of minimal value because "[a] medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner. . . ." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir.2005)(citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).

17

that Gonzales has "legitimate limitations, but is employable" and on Dr. Bowman's correspondence date July 20, 2003, in which he stated, *in part,* that Gonzales has problems that will be an impediment to "strenuous" employment.

The ALJ's recitation of portions of the June and July 2003 records of Dr. Bowman are taken out of context. Dr. Bowman also states, in reference to Gonzales:

> [H]e continues with significant pain and disability. Unfortunately these residuals have generated a good deal of depression as well. He has significant residual symptoms which significantly interfere with his ability and potential to remain active through a given day. I think this will be a significant impediment for him to be involved in gainful employment which involves long hours of strenuous activity. At this time, he continues to require frequent breaks and even periods of recumbency through the day in order to maintain reasonable levels of comfort and function. It would appear that this state will be to some degree permanent. As it is well established and as you can see from the note, I think he is at maximum medical improvement. These opinions are reached with a reasonable degree of medical certainly.

(Tr. 327; see also June 13, 2003, record at 328). The ALJ did not directly address Dr. Bowman's recommendation about frequent breaks and periods of recumbency.

I find that the opinions of Dr. Bowman are entitled to controlling weight. Dr. Bowman was Gonzales's treating physician for more than a year. Dr. Bowman had specialized training in the treatment of the spine; he diagnosed Gonzales's need for surgery and performed the interbody spinal fusion at L5-S1. He followed Gonzales through his recuperation, prescribed medications for pain, referred him to physical therapy sessions and sought out a functional capacities evaluation in an attempt to return him to employment. His treatment records and findings on examination are consistent with the findings of Gonzales's former treating physician, Dr. Messer. It is clear from the medical records that chronic pain and pain management are the primary treatment concerns for Gonzales. Dr. Bowman's opinion, which is informed by his own treatment of Gonzales, the

18

notes of the physical therapists, and the functional capacities evaluation performed by Barbara Yarborough, is that despite the objective medical findings on MRI and other testing, Gonzales is not able to engage in employment without frequent periods of rest and recumbency, which means he must lie down frequently throughout the day.

Dr. Bowman's opinion is somewhat at odds with the opinion of Dr. Reed who evaluated Gonzales on one occasion.  In his report of February 23, 2003, Dr. Reed concedes that he did not doubt that Gonzales was experiencing pain, stating "pain certainly is an issue."  Dr. Reed qualifies that statement with the observation that "perhaps there is some secondary gain on Mr. Gonzales' part referable to his current status" based on his submaximal effort during testing, the documented solid fusion, and the lack of other neurologic deficits. " (Tr.148).  Dr. Reed notes that Gonzales has 4 positive out of 7 total Waddell signs, but that "on special testing, abnormal illness behavior is present." (*Id.*)  Dr. Reed admits that because he has considerable questions as to reliability and accuracy of the testing, "it is impossible . . . to give an assessment of work tolerability."  In addition, Dr. Reed did not have the benefit of Dr. Bowman's notes from June 13, 2003 or his final impressions recorded on July 20, 2003, before he prepared his report.  Because of the inconclusive nature of the testing and the inconsistent results in Dr. Reed's report, I conclude that the ALJ's reliance solely on Dr. Reed's report in determining Gonzales's RFC does not constitute substantial evidence in the record as a whole.

In contrast, Dr. Bowman's reservation about Gonzales's ability to work without frequent breaks and periods of recumbency led vocational rehabilitation consultant Steven Kuhn to conclude that Gonzales "may not be able to participate in work on a regular basis as is required by employers."  Relying on Dr. Bowman's conclusion that Gonzales requires

19

frequent breaks and periods of recumbency through the day, Kuhn observed that "[e]mployers, unless special accommodations are made, do not provide this type of work environment." (Tr. 131).  In the same report dated August 15, 2003, Kuhn stated his opinion that Gonzales, without medical improvement, is totally disabled, and he acknowledged that this opinion modifies his prior opinions based on Gonzales's inability to participate in activities throughout a normal work day.  (Tr. 132).

Because substantial evidence does not support the ALJ's determination of Gonzales's residual functional capacity, specifically including Gonzales's ability to stand or walk for up to four hours with regular breaks during an eight-hour workday and Gonzales's ability to sit for up to six hours with regular breaks during an eight-hour workday, I conclude that the appeal should be granted. An erroneously-determined RFC cannot provide substantial evidence to support a denial of benefits. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2000).

**Subjective Complaints & Polaski Standard**

As an alternative basis for the appeal, Gonzales argues that the ALJ improperly discounted his testimony. In the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain and weakness, which are difficult to measure, solely because there is a lack of objective evidence.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) and *Masterson*, 363 F.3d at 737.  In this case, there is an objective basis for Gonzales's complaints of pain.  Dr. Bowman and Dr. Summerlin, a physiatrist who is an expert in the area of rehabilitative medicine, have diagnosed chronic pain and restricted Gonzales's employment to work that would allow frequent breaks and periods of

20

recumbency.  In a similar situation, the Eighth Circuit Court of Appeals has stated that

"consistent diagnosis of chronic . . . pain, coupled with a long history of pain management

and drug therapy," was an "objective medical fact" supporting a claimant's allegations of

disabling pain.  *O'Donnell v. Barnhart* , 318 F.3d 811, 817-18 (8th Cir. 2003)(quoting *Cox*

*v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998)).

Given the objective basis for Gonzales's subjective complaints, an ALJ may discredit

subjective complaints only if these complaints are inconsistent with the record as a whole.

*See Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994).  The Eighth Circuit Court

explained the required analysis in *Polaski v. Heckler*:

> The adjudicator must give full consideration to all of the evidence presented
> relating to subjective complaints, including the claimant's prior work record,
> and observations by third parties and treating and examining physicians
> relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d at 1322. *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir.

2002).

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide,

but such assessments must be based upon substantial evidence.  *Baldwin v. Barnhart,* 349

F.3d 549, 558 (8th Cir. 2003).  The ALJ must make express credibility determinations and

set forth the inconsistencies in the record that cause the ALJ to reject a claimant's

testimony and statements.  *Robinson v. Sullivan*, 956 F.2d 836, 839 (8th Cir. 1992).  Thus,

"when a plaintiff claims that the ALJ failed to properly consider subjective complaints of

pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson,* 363 F.3d at 739 (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987)).   The Court will defer to the ALJ's judgment on the claimant's credibility, but only when the ALJ has given good reasons for discrediting the claimant's credibility. *Fredrickson*, 359 F.3d at 976 (*quoting Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir.2001)).

Regarding Gonzales' credibility, the ALJ stated:

[T]he undersigned does not find that the claimant's statements about the effect of symptoms and his alleged limitations are fully credible in light of inconsistencies between his statements and the notes and opinions of treating physicians, and while the undersigned recognizes that the claimant's impairments may cause his some discomfort and pain, the law is clear that "disability' requires more than the mere inability to work without pain. *Ray v. Bowen*, 865 F.2d 222, 225-26 (10th Cir. 1989).

Because I find that the specific conclusions that the ALJ reached with regard to "inconsistencies" in Gonzales' testimony are not supported by substantial evidence, as explained below, I conclude that the ALJ's credibility determination regarding Gonzales cannot be affirmed.

A claimant's RFC must be based on all of the relevant evidence, which expressly includes  "an individual's own description of [his] limitations." *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003).   "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths

and weaknesses." *Reed v. Barnhart*, 399 F.3d 917, 922 (8th Cir. 2005)(quoting SSR 85-16).

I have considered the ALJ's report and find that in at least four instances, the ALJ failed to draw meaningful inferences from Gonzales's statements and testimony.  In the first instance, Gonzales testified that he needs to lie down approximately four times a day for a "few hours" at a time.  The ALJ inferred from this testimony that Gonzales requires 12 hours of what the ALJ characterized as "naps" during the day.  (Tr. 9N-10N).  The ALJ concluded that Gonzales's failure to include napping as part of his daily activities, as he described them in September 2002 and again during the hearing, was inconsistent with his testimony that he needed 12 hours of napping.  (Tr. 10N).  I reject the ALJ's attempt to identify an inconsistency in Gonzales's statements on this basis, because, simply put, lying down to rest is not the equivalent of napping.  Gonzales expressly testified that while he reclined, he engaged in other activities such as watching television, listening to the radio, reading the newspaper, talking on the phone and visiting with his spouse.  (Tr. 35-36).

Second, the ALJ attempted to show an inconsistency between Gonzales's testimony describing his physical limitations and Gonzales's testimony regarding his weight.  The ALJ concluded that Gonzales's testimony about his weight -- at the hearing, Gonzales said he weighed approximately 150 pounds, down from a 163 pound high  -- demonstrates that Gonzales "apparently is much more activity [sic] than what he portrays." (Tr. 10M).  I find that any inference that Gonzales is much more active than he admitted to being that is drawn from the fact of his weight loss is unsubstantiated. There is no

23

evidence of the reason for Gonzales's weight loss, which is hardly significant,[2] and Gonzales was at the time of the hearing still fifteen pounds heavier than his self-described "normal" weight.

Third, the ALJ inferred from Gonzales's arrest for DUI more than a year before the hearing that he "was apparently able to go out and socialize with his alleged pain." There are no facts in the record regarding Gonzales's activities immediately prior to his DUI arrest. Even if this Court were to assume that Gonzales was "socializing" before being arrested for DUI, the Eighth Circuit Court has "repeatedly stated that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Hogg v. Shalala*, 45 F.3d 276, 279 (8th Cir. 1995); *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).

Finally, the ALJ states that Gonzales testified that "he is unable to walk up and down stairs and steps." From this evidence, the ALJ attempted to identify an inconsistency in Gonzales's statements, observing: "[Y]et interestingly, he lives in a mobile home and thus his mobile home must be located at "ground level" for the claimant to avoid walking up and down steps." That Gonzales retains the ability to enter his mobile home is not a reasonable basis for finding an inconsistency in his statements.

These four inferences are not supported by the evidence. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). For these reasons, I reject the ALJ's decision to discount Gonzales's testimony on the basis that Gonzales made inconsistent statements regarding his functional abilities and level of pain.

---

[2] At the time of the hearing, Gonzales testified that he was still 15 pounds heavier than what he described as his "normal" weight of 135 pounds. (Tr. 29-30).

24

On view of the entire record and hearing testimony, I conclude that substantial evidence does not support the ALJ's determination that Gonzales's pain complaints are inconsistent with the medical evidence of record and his own testimony concerning his daily activities.   Rather, in evaluating the factors outlined in Social Security Regulation 96-7 and *Polaski*, I find 1) uncontroverted evidence that Gonzales attempted to return to work in 2001 but was unable to sustain the work because of pain; 2) Gonzales's description of his daily activities is consistent with his description of pain and fatigue, and Gonzales's testimony is consistent with the symptoms and description of activities as he reported to the various doctors and consultants, and is corroborated by the statements of his spouse; 3) he has taken strong prescription medications for more than four years under a doctor's supervision, specifically Davorcet and Soma and for a time Vioxx, to  manage his pain; and 4) treating physician Dr. Bowman and vocational rehabilitation specialist Steven Kuhn have concluded that Gonzales requires significant periods of rest and recumbency during an ordinary workday.   I find that Gonzales has availed himself of many pain treatment modalities, including a TENS unit, physical therapy, and pain medications.   He has been cooperative in undergoing diagnostic tests including several MRIs and electrodiagnostic assessment, and he has been open to participation in a pain clinic.

There is no doubt that there is some evidence that Gonzales did not give full effort in the testing and that he was guarded in his presentation to both physicians and the rehabilitation consultants.  However, these objective findings, when compared to the record as a whole, do not constitute substantial evidence.   As Dr. Simpson observed, "This is a complex case."

25

Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *See Cox v. Apfel*, 160 F.3d 1203, 1206-07 (8th Cir.1998). In determining whether existing evidence is substantial, the Court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). *See also Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). I conclude that the evidence of Gonzales's ability to work with regular breaks is not substantial, and that the evidence in this record is not adequate to sustain the ALJ's conclusion that Gonzales is not disabled under the Act. While Dr. Bowman has stated that he believes Gonzales is employable, he qualified that opinion by stating that he has a need for frequent breaks and periods of recumbency. When the VE was asked to consider the hypothetical employee that had all of the restrictions identified by the ALJ, but also required frequent breaks and periods of recumbency, the VE stated that none of the jobs identified by him would be available to the worker. That is, no light, sedentary jobs would be available.

For all these reasons,

1.    The Plaintiff's appeal is granted;

2.    The decision of the Commissioner is reversed, and the matter is remanded for to the Commission for the calculation of benefits due to Anthony Gonzales in accordance with this Memorandum and Order; and

3.    A separate judgment shall be entered.

DATED this 16th day of October, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

26